# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### NORTHERN DIVISION
### AT COVINGTON

CIVIL ACTION NO. 09-119-DLB

MICHAEL HODGE                                                          PLAINTIFF

vs.                          MEMORANDUM OPINION AND ORDER

DOLLAR GENERAL                                                         DEFENDANT

* * * * * * * * * * * * * *

Plaintiff Michael Hodge ("Hodge") commenced this employment action against Defendant Dollar General ("Dollar General")[1] alleging that he was retaliated against and wrongfully discharged for filing and pursuing a worker's compensation claim in violation of Kentucky law, K.R.S. § 342.197.  The Court's jurisdiction is based on diversity.

This matter is currently before the Court on Defendant's Motion for Summary Judgment (Doc. # 41).  The motion has been fully briefed, (Docs. # 41, 45, 47), and the matter is now ripe for review.  For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Michael Hodge began working for Defendant Dollar General on July 10,

---

[1] In its Motion for Summary Judgment, Defendant indicates that Plaintiff has sued the wrong party, as Dollar General Partners was Plaintiff's employee, not Dollar General.  Defendant is amenable to an amendment of the Complaint at this point but states that if no such amendment is made, Defendant's Motion for Summary Judgment should be granted because Plaintiff has sued the wrong party.  Plaintiff appears to take issue with Defendant's assertion because (1) The First Report of Injury lists "Dolgencorp, Inc." as Plaintiff's employer; and (2) Plaintiff's workers' compensation checks were issued by "Dollar General Corporation.  Given that the issue was not significantly clarified in the parties' briefing, the Court declines to rule on this issue.  Defendant's motion will be addressed on the merits.

2005.  He was hired as a store manager, and, after a brief training period, he began working at the Covington Store, No. 7131.  *Id.*  As store manager, Hodge was the highest ranking employee in the Covington Store.  At all times relevant to this action, Hodge's direct supervisors were District Manager Marc Mangiarelli and Regional Manager Tina Napier.  However, Mangiarelli only began managing Hodge's District, No. 316, towards the end of January 2007.  Prior to Mangiarelli taking over, Mike Pennington was Hodge's direct supervisor.  Mangiarelli oversaw approximately fifteen stores in the district, and Napier oversaw fifteen districts, including over two hundred stores.

Hodge's duties as Store Manager included the following: (1) recruiting, hiring, training, scheduling, supervising, counseling, and making termination recommendations for store employees; (2) management of inventory and expenses, including the payroll budget; (3) ensuring that the store is clean, neat, and well-stocked; and (4) ensuring the protection of company assets, including shrink management[2] and all functions relating to opening and closing the store, refunds, cash handling, deposits, register overrides, cash pulls deposit preparation, and delivering deposits to the bank.

As a part of his duties as store manager, Hodge was responsible for following Dollar General's Standard Operating Procedures (SOP).  The SOP contained detailed policies and procedures regarding the operation of the store's safe, the change fund, the daily cash envelope, weekly sales and cash analysis envelope, clerk cash balancing slips, cash handling, end of shift financial reports, cashier accountability progressive counseling,

---

[2] Shrink is the retail industry term to describe the loss of profits through various operational deficiencies.  According to Napier, shrink is controlled and reduced through compliance with Dollar General's policies, procedures and other programs.  *Id.*

deposits, and the weekly store deposit log. Hodge had reviewed and understood the SOP, as well as Dollar General's Handbook. Hodge also received specific training on cash handling and was familiar with deposit logs and deposit policies. He recognized that, as store manager, he was responsible for making sure that his employees were adhering to Dollar General's policies and disciplining employees if they failed to follow such policies.

### A.  Hodge's Performance Prior to Workplace Injury

On February 19, 2007, Mangiarelli presented Hodge with his 2006 Store Manager Performance Review. In his review, Hodge received an overall score of .95 on a scale of 0-3.0, which indicated a particularly low score. A score of 1.0 meant the manager needed improvement; 2.0 meant the manager was meeting expectations; and 3.0 meant the manager was exceeding expectations. Hodge received a score of 1.0 or lower in nine out of the twelve categories. Most notably, Hodge received a score of zero in Theft Management.

On several occasions, including the Asset Protection audit in January 2007, Mangiarelli visited the Covington Store and discussed with Hodge the lack of company controls and standards in the store, particularly with regards to cash handling, cleanliness, stock level and recovery. Mangiarelli also took pictures of the store so he could "catalogue progress and identify opportunities." (Doc. # 43-6, at 23). For example, on March 15, 2007, Mangiarelli visited the Covington Store and found that almost no items being used in the restrooms or for recovery had been properly accounted for using Dollar General's store use guidelines. Mangiarelli showed Hodge the list of items acceptable for store use as listed in the SOP Manual and further coached Hodge on the inventory impacts if the

policy was not followed properly.

Given the store's condition, Mangiarelli was instructed by Napier to contact Field Employee Relations (FER) Manager Yvonne Barrett at corporate to see what previous counseling Hodge had received under former District Manager Pennington. They discovered that "no documentation had been done with Mike Hodge" prior to Mangiarelli starting with the company. (Doc. # 43-6, at 23).

### B. Workplace Injury

On March 21, 2007, Hodge suffered a workplace injury when he fell off a ladder and a box of canned goods landed on his neck. Shortly thereafter, Hodge notified Dollar General of the incident and began seeking medical treatment for his injury from orthopedic specialist, Dr. LeRoy Shouse.[3] Dr. Shouse first restricted Plaintiff's lifting capacity to no more than twenty pounds and then later restricted him to thirty hours per week and no lifting at all.

### C. Disciplinary Counseling in April 2007

On April 24, 2007[4], Mangiarelli issued two disciplinary counseling forms to Hodge–a progressive written counseling and a progressive final written counseling.[5] The written

---

[3] It is unclear from the record exactly when Dollar General was first made of aware of Hodge's workplace injury. However, the record reveals that on on March 28, 2007, Workers' Compensation Adjuster Cheryl Lutts spoke to Mangiarelli who advised Lutts that Hodge fell off a ladder at work. Moreover, on March 30, 2007 Lutts spoke directly to Hodge, confirming the incident and authorizing Hodge to see an orthopedic specialist.

[4] The written counselings were actually completed on April 10, 2007, but due to "scheduling conflicts both store internal and external," Mangiarelli was not able to present the written counselings to Hodge until April 24, 2007. (Doc. # 43-2, at 2).

[5] The second written counseling was upgraded to a final written counseling per FER Manager Barrett, who advised Mangiarelli that when the whole store is non-compliant with the cash handling policy, Dollar General goes straight to a final written counseling.

counseling provided that the Covington Store was in substandard condition despite the fact that a full staff of management employees from the region had spent several days cleaning and organizing the store from March 31 to April 2, 2007.[6] The final written counseling concerned Hodge's repeated violations of Dollar General's cash handling policies. Mangiarelli stated as the basis for the counseling that Hodge was "not enforcing Dollar General's cash handling policies by allowing the clerk balancing slips[7] to be filled out incorrectly on a daily basis ... [and] there are shortages or overages in excess of $1.99 and no counseling was given to any associate ... and the District Manager was not informed of any overages or shortages ... ." (Doc. # 43-3, at 2). The Covington Store was also posting cash shortages for every week starting March 15, 2007, totaling $318.81. Prior to issuing the counselings to Hodge, Mangiarelli had discussed Hodge's failure to comply with the company's cash handling procedures with FER Manager Barrett. On April 20, 2007, Barrett opened a case on the matter, entitled "FER-Rationale-Violation of Company policy or procedure-Counseling." (Doc. # 46-1, at 8). After reviewing the documentation submitted to her by Mangiarelli, she supported his decision to issue a final written

---

In his response, Plaintiff alleges that he did not receive any verbal or written counseling, as prescribed by Dollar General's Progressive Disciplinary Policy prior to being issued the final written counseling for cash handling and the written counseling for his store's condition. However, Plaintiff provides no citation to the record for his assertion. The Court's own review of Dollar General's SOP reveals that there is no requirement that a verbal counseling be issued prior to a written counseling or that a written counseling be issued prior to a final counseling. (Doc. # 42-1, at 32-33) ("Written counseling can be appropriate for some first offenses. ... Final counseling is also appropriate for some first-time offenses."). Moreover, the record reveals that although Hodge never received any formal written counselings, on several occasions prior to the write-ups, Mangiarelli discussed with Hodge the lack of company controls and standards in the Covington Store, particularly with regards to cash handling, store standards, cleanliness, stock level and recovery.

[6] Shortly after the clean-up and before the written counseling, Mangiarelli had discussed with Hodge how the store had "fallen back down already" in terms of the store's cleanliness. (Doc. # 43-2).

[7] The parties use the terms "clerk balancing slip" and "cash balancing slip" interchangeably throughout their briefing.

counseling for failure to follow cash handling procedures. She noted that Mangiarelli would review the cash handling procedures with Hodge to ensure that Hodge understands his responsibilities. That same day, Barrett closed the case.

Hodge did not completely agree with the disciplinary counselings he received. With regard to the store's condition, Hodge stated that given (1) the neighborhood the store is in, (2) the hours allotted to him, and (3) his workplace injury, "it is a struggle to keep this store perfect." (Doc. # 43-3, at 2). In response to the cash handling procedures, Hodge stated that he did counsel cashiers on shortages and that his cash balance sheets were correct.[8] However, despite Hodge's contention that he complied with the company's cash handling policies, he admitted that there were several clerk balancing slips that were missing either the clerks' or managers' initials and that it was his responsibility as store manager to ensure that the employees were properly completing the clerk balancing slips. In order for the clerks to be held accountable for the money in their respective registers, the clerk balancing slips had to be properly initialed and completed.

At the time Hodge received the progressive written and final written counselings, another matter involving Hodge was under investigation. On April 24, 2007, Asset Protection (AP) Manager Steve Turner called Hodge to discuss a missing deposit, totaling $1,497.35, from the Covington Store on April 7, 2007. On the Weekly Store Deposit Log, Hodge signed and verified that he prepared the missing deposit, meaning that he counted

---

[8] Hodge also contends that at the time he received the final written counseling, the policy regarding shortage/overage amounts had changed. The policy used to require managers to counsel employees when their register was short or over by a $1.99 or more. However, at some point, the amount changed to $4.99 or more. Hodge stated that he was made aware of the policy change via a voice mail from Bill Bass and later received a hard copy in the mail. Assuming the amount was $4.99, Hodge was still in violation of company policy because he was not placing the cash accountability write-up forms in the store's safe.

the money, selected the bank bag number, and put the money into the bag. However, the deposit log did not reveal any other signatures for that deposit, indicating who removed the money from the store and deposited it or who validated the deposit ticket. According to Hodge, he left work early that day, and his assistant manager April Taylor closed the store. Hodge testified that he does not know what happened to the missing April 7th deposit.

During the same phone conversation, Turner also discovered that Hodge falsified the same Weekly Store Deposit Log by signing his name and verifying that he removed certain deposits from the store, deposited the money at the bank, and validated the deposit tickets for three different deposits–one from April 7, 2007 and two from April 9, 2007. In fact, Hodge did not remove or deposit the money and did not validate the deposit tickets. Hodge acknowledged that it was a violation of company policy for him to sign the Weekly Store Deposit Log for these particular deposits, and, as store manager, he was responsible for following and enforcing the deposit handling and form completion policies. Moreover, Hodge admitted that the falsification of company records was grounds for immediate termination. However, Hodge claimed that at that time he signed the deposit log, he did not understand that he had violated company policies because he was "under heavy medication" for his injuries.[9] (Doc. # 44-8, at 2).

On April 25, 2007, one day after receiving the progressive counselings, Hodge called Dollar General's employee hotline and reported that (1) Mangiarelli was removing paperwork from the store without his knowledge; (2) Hodge was on a reduced schedule due to his injury and was not being given enough hours to run the store; (3) Hodge was

---

[9] Plaintiff indicated that he was taking Oxycontin, Vicodin and steroids.

being harassed for a missing deposit which occurred on a day he was not working due to a doctor's appointment[10]; and (4) Hodge felt that Mangiarelli was trying to get rid of him. After receiving the hotline complaint, Barrett asked Hodge if he would be willing to provide a statement clarifying the issues raised in his complaint. The following day, on April 26, 2007, Hodge faxed Barrett a four-page, handwritten letter further explaining his position and noting that he believed he was being discriminated against and punished for filing a workers' compensation claim. After receiving Hodge's letter, Barrett began investigating the matter.

After Mangiarelli issued Hodge the two progressive counselings, Mangiarelli reported his findings back to Barrett. In turn, Barrett asked Mangiarelli about the specific allegations Hodge made in his complaint. Barrett also contacted Asset Protection and asked for a summary of Turner's interview with Hodge. After considering Hodge's allegations and the information she received concerning his company violations, Barrett recommended that Hodge be terminated for (1) falsifying company records; (2) failing to protect company assets by signing a weekly deposit log for a day he was not even at work; and (3) failing to follow cash handling procedures. However, for reasons not stated in the record, Hodge was not terminated at this time.[11]

---

[10] The missing deposit was actually from April 7, 2007, a day that Hodge worked in the morning and then left in the afternoon for a doctor's appointment. Hodge actually signed the deposit log as preparing the deposit in question. *Id.*

[11] In its Motion for Summary Judgment, Defendant argues that it "gave Plaintiff a break" as a result of his workplace injury and, therefore did not terminate him at this time. (Doc. # 41-2, at 7). However, Defendant provides no citation to the record to support this rationale. Plaintiff asserts that Defendant did not fire Hodge at the time because it did not have a justifiable reason for doing so. Although, this rationale also lacks support from the record as Hodge admitted he could have been fired for falsifying the deposit log.

### D. Plaintiff's Leave: April 26 - July 4, 2007

Only two days after Hodge received his progressive counselings, he commenced a period of leave due to his workplace injury at the instruction of his treating physician, Dr. Shouse. Hodge remained off work for approximately two months, and, on June 26, 2007, Dr. Tutt, a neurologist who Dr. Shouse referred Hodge to, instructed Hodge that he could return to work without any restrictions. However, Hodge did not return to work until July 4, 2007.

### E. Plaintiff's Performance Issues After Returning to Work[12]

After Hodge returned to work, his work performance continued to be monitored.[13] Mangiarelli also asked Assistant Manager Dawn Hawkins to keep track of Hodge's activity. In a written statement dated November 5, 2007, Hawkins stated that Mangiarelli told her that if she did this for him, she "would have the store when [Mangiarelli] got [Hodge] out of there." (Doc. # 46-3, at 25). Hawkins testified that Hodge frequently showed up late for work and, once at work, retreated to his back office and failed to delegate duties among the employees. Furthermore, video surveillance of the Covington Store on July 5, 2007 revealed that a man entered and then exited the store twice with two large bags of unpaid merchandise right in front of Hodge.

---

[12] Even after Hodge was released to work with no restrictions, he continued to miss work due to alleged doctor appointments and emergency room visits. Moreover, Hodge contends that on August 2, 2007, he was knocked over by a customer escaping the store with a cart of groceries and aggravated his prior back injury. However, Plaintiff only provides a doctor's note from Dr. Shouse recalling the incident and presents no evidence that he ever reported the August 2, 2007 workplace injury to anyone at Dollar General. According to Dollar General's workers' compensation department, Hodge's workers' compensation benefits ended on June 26, 2007 when Dr. Tutt released Hodge to work without any restrictions.

[13] On June 8, 2007, while Hodge was on leave, Mangiarelli visited the Covington Store to retrieve the paperwork needed to enter the cutoff for inventory on June 13, 2007. He discovered that the transaction analysis sheets were in complete disarray and had not been properly cleared since February's sheet came out in early March 2007, prior to Hodge's leave.

On July 11, 2007, Mangiarelli implemented a "Store Specific Action Plan" for the Covington Store, outlining what Hodge needed to do to keep the store up to company standards. Mangiarelli also reviewed with Hodge the company's SOP Manual on cash balancing slips, deposit logs, transaction analysis logs, and inventory awareness. Mangiarelli believed that the failure to follow Dollar General's policies on these particular issues was a major cause of the Covington's Store shrink problems.

Despite his prior written counselings and Mangiarelli's action plan, Hodge continued to violate Dollar General's cash handling polices. Hodge failed to complete cash balancing slips pursuant to company policy and failed to properly counsel employees for incorrectly filling out cash balancing slips and cash register shortages/overages. Moreover, he also failed to verify the store's weekly deposit logs, many of which were not properly completed. In his deposition, Hodge admitted that the cash balancing slips were not completed pursuant to company policy, but did not believe it was that "big of a deal" since those particular slips did not show any shortages or overages. (Doc. # 41-4, at 25). He also admitted that several deposit logs for July 2007 were not verified or completed properly. Furthermore, per company policy and specifically stated in the July 11, 2007 Store Specific Action Plan, Hodge was supposed to use the EZ Schedule and Planner each day.[14] However, Hodge failed to comply with this policy, as well.

On August 8, 2007, Mangiarelli reported Hodge's continued performance issues and supplied documentation concerning the same to Barrett. When Barrett briefed another FER employee, Ivan Reeves, on the matter, he recommended that Barrett hold a

---

[14] Dollar General utilized a program called EZ Store that allowed store managers to delegate duties to the other employees for the day.

conference with Mangiarelli and Hodge to clarify whether Hodge understands Dollar General's policies and procedures and to advise him that from this point, he must ensure that the Covington Store follows company policy. During this investigation, although it is unclear from the record, someone at Dollar General, either in FER or the legal department, recommended that Hodge be issued another FPC for failing to follow cash handling procedures. However, Hodge was not issued another FPC at this time.

On October 8, 2007, Barrett initiated a telephone conference with Hodge and Mangiarelli to discuss Hodge's continued failure to comply with company policies. Barrett recorded that they specifically discussed the following: (1) that the cash balancing slips were not being completed pursuant to company policy; (2) that cash handling procedures were not being followed; (3) that deposit logs were not being completely filled out; and (4) that no one was being held responsible for shortages in the store or for failing to follow cash handling policies. While Hodge disputes some of the specifics of the conversation, he testified that they discussed cash handling polices, the incomplete deposit logs, and the lack of disciplinary action being taken against employees who were not following company policies. Hodge also admitted that Barrett told him he would be held responsible for the store's failure to follow cash handling procedures and must work toward getting the store up to company standards.

During this time, Hodge also faxed a handwritten letter to Barrett requesting a transfer to another Dollar General store in Maysville because it was closer to his home, and it took him over an hour to commute to the Covington Store. Hodge stated that his previous manager, Mike Pennington, promised him that he would eventually be able to transfer to the Maysville Store, but Mangiarelli refused to transfer him because of the

Covington Store's high shrink. Barrett conducted another investigation into the matter and was made aware of the store's high shrink and the July 5, 2007 theft incident that took place right in front of Hodge. On November 19, 2007, Barrett denied Hodge's transfer request and, according to Hodge, told him that he could not be transferred because of his April 24, 2007 counselings. Hodge questioned Dollar General's motives because the SOP Manual stated that employees on written or final counseling may not be able to transfer until ninety (90) days after the counseling or the end of the action plan (in Hodge's case May 1, 2007), whichever is greater. However, Hodge failed to note that the SOP Manual also stated that transferring employees require district manager approval, which Mangiarelli had not given.

On October 27, 2007, an audit was performed at the Covington Store. The audit revealed that the Covington Store had a shrink level of $143,000, i.e., $143,000 worth of inventory was missing from the store. More significantly, this was an increase of approximately $50,000 from the previous year. The audit also revealed a low score in asset protection. For example, the back door of the store was not secure, associate purchases for in-store consumption did not have receipts attached, the floor contained merchandise that had expired, transaction analysis logs were not current and up to date, return/refund slips were missing the appropriate signatures, and paid out slips did not have receipts or bills attached. However, at this particular time, the store was doing much better with the cash balancing slips and deposit logs.

Nevertheless, when Mangiarelli followed-up on November 15, 2007, it was discovered that Hodge, again, continued to disregard several cash handling policies. For

example, he failed to provide manager approval on customer returns and exchanges. Managers are required to sign-off on customer refunds and exchanges to reduce the opportunity for internal theft and discourage employees from performing fraudulent transactions. Moreover, cash balancing slips continued to be incomplete and were missing the clerk's initials for the initial till verification and the clerk's and manager's initials for the cash count at the end of the shift, thereby prohibiting Dollar General from holding the clerk responsible for shortage amounts. Mangiarelli then forwarded this information to Barrett.

### F. Plaintiff's Termination[15]

On November 27, 2007, Barrett determined that Hodge continued to violate Dollar General's company policies and procedures and made the following observations: (1) the October 26, 2007 audit indicated that Hodge continued to fail to follow company policies to secure Dollar General's funds/assets; (2) cash handling policies continued to be ignored; and (3) Hodge had been previously coached to follow these policies on October 8, 2007. Therefore, Barrett recommended that Hodge be terminated for failing to follow cash handling procedures. Based on Barrett's conclusions and recommendation, Dollar General terminated Hodge on December 7, 2007. However, the record is unclear as to who was directly responsible for the termination decision.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[15] At some point prior to Hodge's termination, his job as manager of the Covington Store was posted on Monster.com.

Fed. R. Civ. P. 56(a).  In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  The moving party may meet this burden by demonstrating the absence of evidence concerning an essential element of the nonmovant's claim on which it will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Once the movant has satisfied its burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, it must produce specific facts showing that a genuine issue remains.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  If, after reviewing the record in its entirety, a rational fact finder could not find for the nonmoving party, summary judgment should be granted.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact."  *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

**B.     Workers' Compensation Retaliation**

Kentucky's common law "terminable at-will" doctrine states that "ordinarily an employer may discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983) (citations omitted); *see also Grzyb v. Evans*, 700 S.W.2d 399 (Ky. 1985). However, the Kentucky Supreme Court has adopted a narrow public policy exception to the doctrine that provides a cause of action for wrongful discharge. *Firestone Textile Co. Div.*, 666 S.W.2d at 734. In *Grzyb* and *Firestone*, the court recognized a cause of action when an employee is terminated in contravention of a statutory or constitutional provision. 700 S.W.2d 399; 666 S.W.2d 730. The *Firestone* doctrine was then codified in K.R.S. § 342.197 in so far as it provides that an employee shall not be "harassed, coerced, discharged, or discriminated against in any manner whatsoever for filing and pursuing a lawful [workers' compensation] claim under this chapter." K.R.S. § 342.197(1). The statute allows an individual injured by any act in violation of the statute to bring a civil cause of action to recover actual damages sustained by way of the violation. *Id.* § 342.197(3).

To state a claim for workers' compensation retaliation pursuant to K.R.S. § 342.197, a plaintiff must prove that (1) he engaged in protected activity; (2) the employer knew that the plaintiff had done so; (3) an adverse employment action was taken; and (4) there was a causal connection between the protected activity and the adverse employment action. *Dollar Gen. Partners v. Upchurch*, 214 S.W.3d 910, 915 (Ky Ct. App. 2006) (citing *Brooks v. Lexington-Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 803 (Ky. 2004)). No

formal workers' compensation claim need be filed in order for the protections afforded against retaliation to apply; it is enough that the plaintiff is "*pursuing* a lawful claim for workers' compensation benefits." *Overnite Transp. Co. v. Gaddis*, 793 S.W.2d 129, 132 (Ky Ct. App. 1990) (emphasis added).

In order to prove that there was a causal connection between the protected activity and the adverse employment action, the employee must establish that the activity was a substantial and motivating factor but for which the adverse employment action would not have been taken. *First Prop. Mgmt. Corp. v. Zarebidaki*, 867 S.W.2d 185, 188 (Ky. 1993). The plaintiff need not prove that the protected activity was the sole or even primary factor motivating the action. *Id.; see also Bishop v. Manpower, Inc. of Cent. Ky.*, 211 S.W.3d 71, 76 (Ky. Ct. App. 2006). The Kentucky Supreme Court has stated that "the employer is not free from liability simply because he offers proof he would have discharged the employee anyway, even absent the lawfully impermissible reason, so long as the jury believes the impermissible reason did in fact contribute to the discharge as one of the substantial motivating factors." *First Prop. Mgmt. Corp.*, 867 S.W.2d at 188. Rarely does the plaintiff have a "smoking gun" to establish an improper motive, and, therefore, the plaintiff must frequently "rely on circumstantial evidence and the inferences that can be drawn therefrom to make his or her case." *Follett v. Gateway Reg'l Health Sys., Inc.*, 229 S.W.3d 925, 929 (Ky. Ct. App. 2007) (quoting *Willoughby v. GenCorp, Inc.*, 809 S.W.2d 858, 861 (Ky. Ct. App. 1990)).

Although both parties reference the burden-shifting framework established for civil rights claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)[16], and commonly used to analyze Kentucky civil rights cases under K.R.S. chapter 344, the Kentucky Supreme Court has never explicitly applied the *McDonnell Douglas* test in the context of a workers' compensation retaliation claim.[17] *Bishop*, 211 S.W.3d at 75; *see also Chavez v. Dakkota Integrated Sys., LLC*, No. 3:09-CV-00540, 2011 WL 2148373, at *13 (W.D. Ky. May 31, 2011); *Futrell v. Douglas Autotech Corp.*, No. 5:09-CV-21, 2010 WL 1417779, at *3 n.1 (W.D. Ky. Apr. 2, 2010). While the Court acknowledges that the *McDonnell Douglas* burden-shifting framework is certainly instructive in assessing the evidence presented in this case, the Court must ultimately determine whether Plaintiff has established that his pursuit of a workers' compensation claim was a substantial and motivating factor but for which the adverse employment actions would not have been taken. *First Prop. Mgmt. Corp.*, 867 S.W.2d at 188; see also *Bishop*, 211 S.W.3d at 75 ("[I]f the employer articulates a legitimate, non-retaliatory reason for the decision, the employee must show that the discriminatory motive was a substantial and motivating factor behind the adverse employment action."). In other words, regardless of Defendant's reason for the adverse employment action, so long as Plaintiff can prove that his pursuit of a workers'

---

[16] Under *McDonnell Douglas*, a plaintiff must first prove a prima facie case of retaliation. *See McDonnell Douglas Corp.*, 411 U.S. at 802. The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for the plaintiff's termination. *Id.* If the defendant sets forth such a reason, the plaintiff must then establish that the nondiscriminatory reason is pretext. *Id.* at 804.

[17] The Court recognizes that the Kentucky Court of Appeals has applied the *McDonnell Douglas* burden-shifting analysis to a workers' compensation wrongful discharge claim. *See e.g., Dollar Gen. Partners*, 214 S.W.3d at 915-16. However, the Kentucky Court of Appeals has also refused to apply the *McDonnell Douglas* burden-shifting analysis to a non-civil rights wrongful discharge claim, noting that a wrongful discharge claim "is similar to, but distinct from [a civil rights violation claim]." *Follett*, 229 S.W.3d at 928.

compensation claim was a substantial and motivating factor in the adverse employment action, he can defeat summary judgment.

In addition to his termination, Plaintiff alleges that he suffered other adverse employment actions in retaliation for pursuing a lawful workers' compensation claim, including the mishandling of his workers' compensation claim, receiving two written counselings in April 2007, and the denial of a lateral transfer to another Dollar General store. The parties do not dispute that Hodge meets the first two elements of a workers' compensation retaliation claim. Hodge pursued a lawful workers' compensation claim, and Dollar General knew that he had done so. Moreover, there is no question that Hodge was terminated from his employment with Dollar General. The issues remaining are whether Hodge suffered additional adverse employment actions and whether there is a genuine issue of material fact to establish a causal connection between his pursuit of a workers' compensation claim and the alleged adverse employment actions, including his termination.

### 1. Adverse Employment Action

In order to establish a workers' compensation retaliation claim based on other acts besides termination, Plaintiff must prove that (1) he suffered an adverse employment action and (2) there was a causal connection between his workers' compensation claim and the adverse employment action. *See Dollar Gen. Partners*, 214 S.W.3d at 915 (citing *Brooks,* 132 S.W.3d at 803). The Kentucky Supreme Court has not defined an "adverse employment action" with regards to a workers' compensation retaliation claim. However the Kentucky Supreme Court has held that Kentucky's civil rights anti-retaliation laws are

to be construed consistently with federal anti-retaliation laws. *Brooks*, 132 S.W.3d 790, 801-02. With no further guidance, this Court will apply the definition utilized in federal anti-retaliation cases.

The Supreme Court of the United States has held that the "materially adverse" action requirement in a retaliation claim is different than the "adverse employment action" requirement in a discrimination claim. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64- 67 (2006) (recognizing Title VII's "antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Consequently, for purposes of a retaliation claim, an adverse employment action is one that the plaintiff would have found materially adverse, meaning it might well dissuade a reasonable worker from making or supporting a charge of discrimination or, in this case, pursuing a workers' compensation claim.[18] *Id.* at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). However, it is necessary to separate significant from trivial harm. "[P]etty slights, minor annoyances, and simple lack of good manners" will not suffice. *Id.*

### a.     Mishandling of Workers' Compensation Claim

Hodge contends that he suffered an adverse employment action when Dollar General mishandled his workers' compensation claim. Hodge raises several issues with the handling of his workers' compensation claim as evidence of retaliation, including Adjuster Lutts' denial of Hodge's doctor's request for an MRI and refusal to pay Hodge's

---

[18] The Kentucky Court of Appeals has recently recognized this broader definition of adverse employment action. *See Kent v. Com., Fish & Wildlife*, No. 2008-CA-001975, 2009 WL 4060493, at * 5 (Ky. Ct. App. Nov. 25, 2009); *Louisville-Jefferson Cnty. Metro Gov't v. Martin*, Nos. 2007-CA-001629, 2007-CA-001803, 2009 WL 1636270, at *9 (Ky. Ct. App. June 12, 2010).

temporary total disability (TTD) benefits.  Plaintiff's argument is misplaced.

The handling of Plaintiff's workers' compensation claim is beyond the scope of this Court's jurisdiction.  *See Brown Badgett, Inc. v. Calloway*, 675 S.W.2d 389, 390-91 (Ky. 1984) (circuit court has no jurisdiction to resolve a dispute over an unpaid medical bill as exclusive jurisdiction lies with the Workers' Compensation Board).  If Plaintiff is not satisfied with how his workers' compensation claim was handled, he must raise these issues with the Kentucky Workers' Compensation Board.

### b.    April 2007 Disciplinary Counselings

Hodge contends that the disciplinary counselings he received in April 2007 were also adverse employment actions taken in retaliation for his pursuit of a workers' compensation claim.  The Sixth Circuit has held that reprimands for misconduct "could dissuade a reasonable worker from making a charge of discrimination *if* they significantly impact an employee's wages or professional advancement."  *Lahar v. Oakland Cnty.*, 304 F. App'x 354, 357 (6th Cir. 2008) (internal quotations omitted) (emphasis in the original) (quoting *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (markedly lower performance-evaluation scores that significantly impact an employee's wages or professional advancement are materially adverse for purposes of a retaliation claim)).  Plaintiff has failed to prove that the April 2007 written disciplinary counselings affected his wages or prospects for advancement at Dollar General.  Therefore, the disciplinary counselings are not adverse employment actions as they would not dissuade a reasonable worker from pursuing a lawful workers' compensation claim.  However, the Court will further address the disciplinary counselings when analyzing Plaintiff's wrongful

discharge claim.

### c. Denial of Lateral Transfer

Hodge asserts that he was denied a lateral transfer to the Maysville Store in retaliation for his pursuit of a workers' compensation claim. Defendant contends that a lateral transfer is not an adverse employment action as it did not result in a materially adverse change in the terms and conditions of plaintiff's employment. *See Momah v. Dominguez*, 239 F. App'x 114,123 (6th Cir. 2007) (a purely lateral transfer or denial of the same, which by definition results in no decrease in title, pay or benefits, is not an adverse employment action for discrimination purposes). However, *Momah* concerned a discrimination claim. As stated above, a plaintiff's burden is less onerous in retaliation cases than in discrimination cases. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 595-96 (6th Cir. 2007) (citing *Burlington*, 548 U.S. at 68).

"Whether a particular [action] is materially adverse depends upon the circumstances of the particular case and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 71 (internal quotations and citations omitted). While a relatively close call, the Court finds that Hodge's denial of a lateral transfer to the Maysville Store was a materially adverse employment action. Hodge testified that it took him over an hour to drive to the Covington Store, and the transfer would significantly cut down on his commute time and money spent on gas. Clearly, given the financial benefits associated with the transfer, a denial of such would discourage a reasonable employee from pursuing a lawful workers' compensation claim.

However, Plaintiff has not presented any evidence to support his belief that the denial of the transfer was precipitated by his pursuit of a workers' compensation claim. The fact that Hodge was apparently promised a transfer by his previous manager is of no consequence. Hodge admitted that Mangiarelli never promised him a transfer and actually told Hodge *prior to his workplace injury* and subsequent pursuit of his workers' compensation claim that improvements needed to be made before a transfer would be discussed. Moreover, Dollar General had a legitimate, non-retaliatory reason to deny Hodge's transfer request–his repeated violations of company policies and the Covington Store's exceptionally high shrink. Hodge also testified that he knew another store manager who was denied a lateral transfer to a store closer to home. This employee's store had "fantastic inventory" (or shrink), and she did not have a workers' compensation claim. (Doc. # 41-4, at 39). Therefore, Plaintiff has not presented a genuine dispute of material fact as to whether their was a causal connection between his pursuit of a workers' compensation claim and the denial of a lateral transfer to the Maysville Store.

### 2. Wrongful Discharge

Plaintiff also alleges that he was discharged from his position as Store Manager in retaliation for pursuing a workers' compensation claim. As stated above, the only remaining question is whether Hodge's workers' compensation claim was a substantial and motivating factor but for which he would not have been discharged. *See First Prop. Mgmt. Corp.*, 867 S.W.2d at 188. Defendant maintains that it had a legitimate, non-retaliatory reason for terminating Hodge given that he continued to violate several company policies despite being counseled on multiple occasions on how he could improve.

Plaintiff argues that the close temporal proximity between his protected activities and termination is sufficient to raise an inference of retaliation. In most cases, because direct evidence is often lacking, the plaintiff must prove that there is a close temporal relationship between the protected activity and the adverse action. *Brooks*, 132 S.W.2d at 804. "The sooner adverse action is taken after the protected activity, the stronger the implication that the protected activity caused the adverse action, particularly if no legitimate reason for the adverse action is evident." *Ky. Dep't of Corrections v. McCullough*, 123 S.W.3d 130, 135 (Ky. 2003) (citations omitted). However, "close temporal proximity" does not require that the employee be terminated within a certain number of days or even weeks of the filing of the worker's compensation claim. *Dollar Gen. Partners*, 214 S.W.3d at 916. Rather, the appropriate analysis is for the Court "to view the time between the two events in the context of the entire circumstances." *Id.*

In this case, Plaintiff was terminated approximately eight months after Dollar General was on notice of his pursuit of a workers' compensation claim.[19] Moreover, the record reveals that not only was Hodge having performance issues prior to his workplace injury, but several intervening performance issues also developed after he began pursuing his claim. Therefore, given the eight month gap between the protected activity and discharge, in addition to the numerous performance issues, the Court finds that temporal

---

[19] Plaintiff argues that the temporal proximity between his protected activity and termination was less than eight months because, after his workplace injury, he engaged in many protected activities, including pursuing his right to receive medical treatment and TTD payments and reporting to Dollar General he was being harassed. However, all of these alleged activities relate to only one activity actually protected under K.R.S. § 342.197—pursuing a workers' compensation claim. Plaintiff began pursuing his workers' compensation claim almost immediately after his workplace injury when he notified Dollar General of the incident and sought medical treatment. For purposes of temporal proximity, Plaintiff cannot start a new clock simply because he continued to seek medical treatment and compensation for his injuries.

proximity alone is insufficient to raise an inference of retaliation in this case.

Aside from temporal proximity, Hodge claims that there is ample evidence to establish a causal connection between his pursuit of a workers' compensation claim and his termination. First, Hodge alleges that the April 2007 disciplinary counselings were evidence of Defendant's retaliatory motive. While he does not necessarily dispute that he was in violation of company policies, he argues that the counselings were issued within days of Dollar General learning of his injury for infractions that occurred prior to his injury. Moreover, the fact that one of his counselings was accelerated to a final written counseling is inconsistent with Dollar General policy. Plaintiff is mistaken.

The written counselings were prepared on April 10, 2007 and issued to Hodge on April 24, 2007. The first written counseling provided that the Covington Store was in substandard condition despite the fact that a full staff of management employees from the region had spent several days cleaning and organizing the store from March 31 to April 2, 2007. Additionally, prior to the counseling, Mangiarelli told Hodge that the store had deteriorated since the clean-up. The second and final written counseling concerned Hodge's repeated violations of Dollar General's cash handling policies ranging from March 15, 2007 to March 29, 2007, which, again, Mangiarelli had previously discussed with Hodge when he visited the store. Despite Hodge's assertion to the contrary, both of the counselings included infractions that occurred after Hodge's workplace injury. Thus, Mangiarelli could not have issued the counselings prior to Hodge's injury. Furthermore, there is no policy against accelerating a written counseling to a final written counseling. Indeed, Dollar General's SOP Manual provides that final written counselings may be appropriate for some first-time offenses. However, this was not a first time offense as the

24

record reveals that Mangiarelli had discussed both of these issues with Hodge prior to his workplace injury. Consequently, the mere fact that the disciplinary counselings were issued shortly after Hodge's pursuit of a workers' compensation claim is not evidence that Plaintiff's workers' compensation claim was a substantial and motivating factor behind his discharge.

Plaintiff also contends that he was subjected to a heightened level of scrutiny after he began pursuing a workers' compensation claim. Whether an employer increases its scrutiny of an employee after he engaged in protected activity is a critical factor in determining whether the employee has met his burden of establishing a causal connection between the protected activity and the adverse employment action. *See Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009). However, in this case, the record certainly supports any heightened scrutiny of Plaintiff's work performance. Unlike the plaintiff in *Hamilton*, who had a clean disciplinary record for nearly a decade before he made an age discrimination claim, Hodge had several documented performance issues prior to his pursuit of a workers' compensation claim. Moreover, in *Hamilton*, the plaintiff raised facts to support his claim that his employer increased its surveillance after he filed his EEOC complaint merely to watch and wait for him to make a mistake. However, the record in this case establishes that Dollar General increased its surveillance of Hodge because of the mistakes he was already making.

While it is true that Hodge never received any written disciplinary counselings prior to his workplace injury, his work performance was certainly being monitored, and for good reason. Because Mangiarelli did not become Plaintiff's direct supervisor until only two months prior to Plaintiff's injury, he did not have an opportunity to discipline Hodge for the

first year and a half that Hodge was employed by the company.  However, from the time Mangiarelli started in January 2007, he was concerned about the status of the Covington Store and, in particular, Hodge's performance as manager.  On several occasions prior to Hodge's injury, Mangiarelli visited the store and specifically discussed with Hodge the lack of company controls and standards in the store, particularly with regards to cash handling, cleanliness, stock level and recovery.  Mangiarelli even took pictures of the store so he could identify opportunities and keep track of progress.  Hodge testified that when he inquired about transferring to another store, Mangiarelli told him that improvements had to be made before a transfer would even be considered.  In February 2007, Plaintiff received a poor performance review and was again made aware of the issues that he needed to address.  Based on Plaintiff's work performance prior to his injury, Dollar General was certainly justified in increasing its scrutiny of Plaintiff's performance, both before and after his injury.

Additionally, Plaintiff argues that there was a causal connection between his workers' compensation claim and discharge, because the individuals responsible for terminating Hodge were working in concert with Dollar General's workers' compensation adjuster.  Plaintiff points to a notation in Adjuster Lutts' log on March 28, 2007 and contends that "Dollar General's workers [sic] compensation department was interested in more than just processing Hodge's claim."  (Doc. # 45, at 2).  The log stated that Mangiarelli told Lutts that Hodge was underperforming in his store but had not yet received a written or verbal warning.  Despite the entry in Lutts' log, the record reveals that prior to Hodge's injury, Mangiarelli had verbally counseled Hodge on company policy and procedures and notified him that improvements needed to be made.  Furthermore, it states

that Hodge is *underperforming*, a legitimate reason for terminating his employment. Plaintiff's suggested inference from this statement alone that Dollar General wanted to terminate Hodge for pursuing a workers' compensation claim is not reasonable. Lutts was not even involved in the decision to terminate Hodge. Moreover, the other communications that Lutts had with Mangiarelli and Barrett regarding Hodge were only to keep each other apprised of Hodge's medical treatment. Apparently, Hodge was not notifying Mangiarelli or Lutts about when he had doctor appointments or how long he was going to remain off work. The fact that they were keeping each other apprised of Hodge's status is not evidence of a retaliatory motive.

Plaintiff also claims that Mangiarelli's statement to Assistant Manager Hawkins that she "would have the store when [Mangiarelli] got [Hodge] out of there," (Doc. # 46-3, at 25), establishes a causal connection between his workers' compensation claim and discharge. However, this statement does not raise an inference of retaliation as it makes no reference to Plaintiff's workers' compensation claim. Additionally, at the time the statement was made, Barrett, with Mangiarelli's assistance, had recommended that Hodge be terminated based on his April 2007 disciplinary counselings and the falsification of the deposit log. It is well-documented that Mangiarelli believed Hodge was underperforming as store manager and should be terminated. Thus, the fact that he wanted to get Hodge "out of there" is of no significance.

Finally, Plaintiff argues that Defendant's proffered legitimate, non-retaliatory reason for terminating Plaintiff was pretext. As stated above, Defendant claims that it discharged Hodge because, after several warnings, he continued to violate Dollar General's policies and procedures, most importantly the cash handling policies. Plaintiff asserts that

Defendants' reason is pretextual because it has no basis in fact, did not actually motivate his discharge and was insufficient to motivate his discharge. Plaintiff's argument is unpersuasive.

Plaintiff cannot prove that Defendant's reason had no basis in fact or was insufficient to motivate his discharge. In fact, Plaintiff admitted to several of the cash handling and asset protection violations. Moreover, he admitted that he falsified a company document and could have been terminated for the falsification. Plaintiff claims that many of his infractions were not a "huge deal" and argues that if he was violating company policy between the time he returned to work and his termination, he should have received discipline for the alleged violations. However, Plaintiff's disagreements as to Dollar General's business practices are insufficient to show pretext and create a genuine dispute of material fact. *Davis v. Carmelite Sisters of Divine Heart of Jesus, of Mo., Inc.*, 116 F. App'x 555, 557 (6th Cir. 2004). Furthermore, Plaintiff was made aware of his repeated violations and Dollar General's expectations. When Plaintiff returned to work, Mangiarelli implemented an action plan for Hodge to follow, and, when Hodge continued to violate company policy, Mangiarelli and Barrett held a telephone conference with Hodge to specifically discuss his infractions and notify him that, from that point on, he would be held responsible for following company standards.

Additionally, Plaintiff cannot prove that Defendant's reason did not actually motivate his discharge. Plaintiff suggests that Dollar General wanted to terminate Plaintiff because he pursued a workers' compensation claim and only waited until it had a legitimate reason to justify his termination. The Sixth Circuit has held that when an employer "waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up [its] true,

longstanding motivations for firing the employee," the employer's actions constitute "the very definition of pretext." *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007). However, the record reveals that Defendant did not wait for a legal, legitimate reason to cover up its true motivation and terminate Hodge, because it had several opportunities to terminate Hodge for legal, legitimate reasons and chose not to.[20] Arguably, Hodge could have been terminated in February 2007 for his poor performance review. Moreover, Hodge himself agreed that he could have been terminated for the falsification of the deposit log in April 2007. After Hodge returned from leave, Mangiarelli once again discussed the company's policies and procedures with Hodge and implemented a specific action plan for him to follow. Hodge repeatedly violated company policies and failed to follow the action plan, but, once again, Dollar General did not terminate Hodge at this time. To the contrary, Mangiarelli and Barrett held a conference call with Hodge to discuss the specific violations and notify him that, from that point on, he would be held responsible for violating company policy. Finally, when Hodge refused to follow the company's asset protection and cash handling policies, he was ultimately terminated. These failures to terminate Hodge when there was a legitimate reason to do so, in addition to the fact that Dollar General made Hodge aware of the violations and their expectations, refute Plaintiff's argument that Defendant's legitimate, non-retaliatory reason did not actually motivate the discharge.

The evidence is clear. Plaintiff had a well-documented record of poor performance as store manager before and after seeking workers' compensation benefits, was notified

---

[20] The Court recognizes that the Sixth Circuit has held that "an employer's intervening 'favorable treatment' does not insulate that employer from liability for retaliatory termination." *Hamilton*, 556 F.3d at 436. However, an employer's favorable treatment, without more, does not imply that Defendant's reason for termination was indeed retaliatory.

of his performance issues and counseled on several occasions on how he could improve, and continued to perform poorly, ultimately leading to his termination on December 7, 2007. Plaintiff has failed to establish a causal connection between his pursuit of a workers' compensation claim and any adverse employment actions, including his termination, and, therefore, no genuine dispute of material fact remains as to whether Dollar General retaliated against and wrongfully discharged Hodge in violation of K.R.S. § 342.197.

### III.    CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. # 41) is hereby **GRANTED**.

This 29th day of August, 2011.



**Signed By:**

*David L. Bunning*   *DB*

**United States District Judge**

G:\DATA\Opinions\Covington\2009\2-09-119 MOO Grant MSJ.wpd